Brevard, J.
This case has been twice argued; once before in January, 1809, and now, at this meeting of the court. When it was first argued, I had but, upon considering the subject, and long before the second argument took place, those doubts were removed. The second argument has not *249 changed the opinion I had previously formed, though I have attended to it with every disposition to receive new. light, and give weight to such new' argu-it „ , • - . ° ments, as had not befor’e been argued or considered. The result of my best judgment, is, that the motion ought to be granted.
The action was assumpsit to recover the balance of a general account current between the patties, as merchants. The plaintiff was an English merchant, and the defendant an American merchant. The defendant claims, and the plaintiff refuses to allow a credit of ^1470 6s. 8d. sterling, the proceeds of & quantity of mahogany and dye-wood, being the cargo of a vessel called Eliza, which was sold by the plaintiff’s agent at Liverpool, as consignee. The defendant insists that the property sold was his, and was consigned by him to the plaintiff, to be sold on his account. The plaintiff contends that the property belongs to Barker and Lord, American mer"chants, and was consigned by them to him to sell on their account. The defendant insists, that some time before the receipt of the cargo, at Liverpool, by the plaintiff, Barker and Lord, assigned over the same to him for a valuable consideration, and that he afterwards took possession thereof, and consigned it to the plaintiff, as his own property. The plaintiff contends that prior to that assignment, he acquired a lien on the property, which the assignment, could not affect, and that he had a right to apply the proceeds in discharge of his lien.
*250 order to decide correctly on these conflicting claims it will be necessary, in the first place, to attend to the relative situations of the parties concerned, and to their connections with each other. The plaintiff wag a mCTchajjt London, the defendant was a mer-merchant in Charleston; Barker and Lord, merchants in Charleston, and the friends of the defendant. The plaintiff acted occasionally as a commission merchant, or factor, for both Barker and Lord, and the defendant ; and shipped goods to them, severally, on their separaté accounts, having a running account with each. Before the assignment in question, Barker and Lord had shipped sundry cargoes to the plaintiff, to be sold on their general account, and had never drawn for more than was customary, having generally a considerable balance, .in their favour. About the time of the assignment they failed$ but the failure was not suspected by the plaintiff, who always considered their credit good till informed to the contrary, after the assignment. The balance of the general account between Barker and Lord, and the plaintiff, was in favour of the latter. The defendant had endorsed notes for Barker and Lord, to the amount of about ¿01700 sterling, which, about the time of their failure, he found it necessary to take up, and, by way of indemnity, took an assignment of the cargo of the Eliza, which, at that time, consisted of lumber. The Eliza had been chartered by Barker and Lord, and Jonathan Wihoay, and freighted with lumber, on an adventure to Jamaica, Honduras and Liverpool, and at the time of the as *251 signment, was on hex* passage from Savannah, in Georgia, in the route of her intended voyage. The assignment imports an absolute and unqualified sale, and transfer of the property, and all the right, title, and interest of Barker and Lord thereto, and therein, to the defendant for a valuable consideration.
It was not seidously contended, that the assignment was not a bona fide transaction, nor that it was not legally competent to change the property, provided the plaintiff had nota pi’e-existing lien on the property, or the defendant had not by his conduct, subsequent to the assignment, given to the plaintiff a light to change the property with the debts due to him, from Barker and Lord, conti’acted on the credit of the cargo, assigned, or that for which it was exchanged. It was indeed slightly insinuated on the first argument, and more directly suggested on the last, that the transaction was colourable and collusive, and had a view to some unfair advantage to the prejudice of the plaintiff; but it was not l’elied upon as a material ground in the cause, and, therefore, I take it for granted, that it was not considered tenable.
As in criminal cases, it is a rule, that, in propor-tian to the atrocity of the ci’ime charged, should be the strength and sufficiency of the evidence to prove it, and that guilt shall never be presumed; so, in civil cases, the same principles of reason and sound policy, on which the rule in criminal cases is found- *252 require the same circumspection, and presumption in favour of innocence, where character and reputation are involved ; hence the rule that fraud shall never be presumed, but must be established by . J strong evidence.
The observance of this rule or maxim, is more especially proper and necessary in mercantile transactions ; because mutual confidence, good faith, fair dealing and punctuality, are the life and soul of business; and, as it is the interest, so it is the custom of merchants, in their intercourse, for their mutual .benefit in the way of trade, to conduct themselves towards each other with liberality and good faith, a different conduct would be sure to produce results unfavourable to their mutual interest, and would certainly end in a onn-intercourse, the evil of which is so much dreaded in mercantile pursuits. Hence arises the propriety and safety of indulging the most favourable presumptions and constructions, in relation to transactions between merchants of good standing and fair character, and of rejecting every suggestion of fraud, collusion and deceit, in relation to such transactions, which is not borne out by the most convincing proof.
On the present occasion, there does not appear to my view a shadow of proof to darken in the smallest degree that part of the case, which relates to the assignment in question. There is no pretence foi saying that it was not an honest and fair transaction» *253 There is no ground for impeaching it, as unlawful, or insufficient to transfer the right of property. But it has been argued, that prior to the assignment, the plaintiff had a lien on the property, which existed at the time oi the assignment, and, subject to which the assignment was made, and the property transferred ; or that he acquired a lien on the cargo, for which the assigned cargo was exchanged with the consent, or by the acquiescence of the defendant, which authorised him to apply the proceeds of the latter cargo, to the payment of his balance against. Barker and Lord.
The presiding judge, at the trial, laid it down to the jury as his opinion, that the assignment was only a qualified and conditional transfer of the property, clogged with, and subject to a superior title to, and interest in, the property which the plaintiff then had; and that, inasmuch as the defendant was acquainted with all the dealings and transactions of Barker and Lord, and did not interpose to prevent their communications with the plaintiff, or give reasonable notice to the defendant of all the circumstances within his knowledge, relating to the cargo in question, and put him on his guard against the consequences of trusting to the faith of the contemplated consignment of the cargo to him, from Barker and Lord, his silence and tacit acquiescence in what was done by Barker and Lord, and those who were connected with them, and acted for them in raising their hopes and expectations of the plaintiff, of a consignment of the cargo to hite by Barker and *254 Lord, and thereby inducing him to accept bills, and incur expense on their accounts, ought to be considered as amounting to an agreement or consent on his part to sanction those proceedings, and yield up his own security to the prior, or better claim of the plaintiff.
Before I attempt to ascertain what the law is upon these points, I shall endeavour to ascertain the facts upon which the law arises. The assignment bears date the 30th July, 1800. It was said in the report of the case, that it did not clearly appear when the assignment really was made. As there was no evidence that it was made at a different time from that which the date of the instrument imports, I apprehend it must be considered as having been made at that time.
I will consider the facts and circumstances of the case, in the order in which they occurred. Some time before the 21st October, 1799, a written agreement was entered into between Barker and Lord and Jonathan Wilway, relative to an intended shipment, and with a view to a charter party of affreightment. A charter party was accordingly executed, from which it appears, that Eliphalet Ludd was to be master and agent of the chartered vessel, Eliza, chartered on the joint account of Barker and Lord and Jonathan Wilway, to sail from Philadelphia to take in a cargo of lumber, to go to Georgia; thence to Kingston, Jamaica; thence to the Bay of Honduras, to exchange the lumber for mahogany *255 and dye-wood; thence, (after touching at Charleston) to proceed to Liverpool. The agreement is not dated. The charter bears date the 21st of Ocr toher, 1799, and, it is presumable, was executed in a very short time after the agreement was concluded.
There is some variation in the terms of stipulation of these two instruments. From the agreement, it appears that the adventure intended for the Liverpool market, was to be consigned to the plaintiff, (Mr. Slater) and Wilway was to he authorised to draw on him for a certain sum. From the charter party, it does not appear that the cargo was to be consigned to the plaintiff absolutely. No doubt, however, it was intended to be consigned to him, as he was the merchant usually commissioned by Barker and Lord to transact buisness of this kind for them.
Great stress lias been laid on the agreement and charter party. It has been contended, that the agreement ought to be considered independent of the charter party; and that both together furnish evidence of a promise or conlract to consign the cargo to the plaintiff, of which he is entitled to avail himself under all the circumstances of this case. The agreement having a view to the charter party, when the latter instrument was executed, pursuant to the intention of the parties, I apprehend the agreement was at an end; and, I presume the parties having a right to vary their contract by mutual consent, might *256 a^er terms of the agreement, and, therefore, must be considered as having done so in departing, in some respects from the agreement in the wording of the charter party. Then if there is nothing contained in the charter party, which obliges Barker and Lord to consign the cargo to the plaintiff, I cannot see with what propriety it can be contended, that he was bound to do so in consequence of these instruments.
But, independently of this, I can discover no ground for contending that, by the agreement, the parties thereto were under any obligation to the plaintiff; nor can I comprehend how the plaintiff can claim any right or advantage from a contract between other persons, to which he was not a party, and in which he had no interest. He might, to be sure, fee] an interest in expectancy, if the parties should.agree to send their cargo to him on consignment; but he could not be entitled to found any right or claim on that expectation, not being under any reciprocal obligation on his part, nor furnishing any considertion for such a claim. It appears to me, therefore, that these documents in themselves supply no evidence to support the plaintiff^ claim in the present case. It remains for future consideration, whether they give any suppoi’t to his claim, taken in connection with the other circumstances of the case.
If it should be said that these documents, combined with other evidence given at the trial, were *257 calculated to inspire the plaintiff with hopes, and . raise expectations which induced him to give credit, ’ or-make advances by which he was ultimately a sufferer, I answer, that all this is foreign to the present enquiry; and that, should it appear that the defendant was aiding and abetting Barker and Lord, in any scheme to impose on the plaintiff or, that Barker and Lord, without any sinister motive, occasioned a loss to the plaintiff by raising expectations, which, were not satisfied; still the plaintiff could derive no relief from the present suit. Though it might be good cause for an action on the case, it would not furnish an item in an action of assumpsit. It would not- give a lien on a specific cargo, intended to be consigned, but never in fact consigned to him ; nor could it give a .lien, if the cargo intended to be consigned, was in fact consigned to him. There must be some better evidence of a lien, which, would be sufficient without the aid of such documents as ^ these- to authorise the appropriation, or retaining of the property of another, on the ground contended for.
After the charter party was entered into, Barker and Lord wrote to the plaintiff, in January, 1800, and advised him óf a draft in favour of Wilway, for ^500, but said nothing on the subject of the intended consignment. From this evidence, it is presumable, that at this time the plaintiff had heard nothing of the agreement, or charter party. At this time, the agreement was extinguished by the charter party; arid by the charter party, it was optional with Barker and Ldrd, and Wilway, to consign to *258 or t° another. On the last day of the same month, (January 7th, 1800,) Barker and Lord wrote again to the plaintiff, informing him of their having chartered the Eliza, and expressing a wish ^ 'ascertain the duties. In this letter they say, that they expect the cargo will be consigned to his address ; and, that they would thereafter advise him. About the same time Wilway, also, wrote to the plaintiff to the same effect; informed him, that Barker and Lord were jointly concerned with him in the cargo, that he was going to Savannah, and that he had a draft from Barker and Lord, for ,¿0500. It appfears that Wilway, was authorised to draw on the plaintiff, on the credit of Barker and Lord, to the amount of ¿£1000; and that he drew for part of that sum. One of his bills was accepted by the plaintiff in April, and another in July, 1800. From the testimony of Tyler, who was the plaintiffs bookkeeper, it appeared that the plaintiff, about this time accepted some bills drawn on him, by Barker^, and Lord, or on their account, to the anjount oi ¿01600, and upwards. He was not certain,-'however, what bills they were, nor on what account, particularly, they were drawn. His opinión was, that they were accepted on the faith and expectation of the consignment of the Eliza’s cargo, of which he was? advised by Barker and Lord, and Wilway.
I think it highly probable that Tyler was mistaken in this opinion, from these considerations. From the advice received the plaintiff had no right to calculate on the assignment unless he did §o at his own *259 risk. His knowledge of business, being a well informed merchant, (as we may fairly presume he was,) precluded the presumption, that he imagined he could safely make acceptance on the security or assu-ranees contained in the letters of Barker & Lord, and Wilway, that the cargo would be consigned to him ; that these letters aiforded him any legal evidence to support a claim upon the cargo, unless it should af-terwards come into his possession by virtue of a consignment from them. Barker and Lord, had dealt with him to a great amount, and had always maintained their credit; and he had no knowledge of any of those circumstances, which soon afterwards occasioned their failure. When he was informed of it, it occasioned great surprise.
It does not appear, that Wilway was authorised to draw for¿g1000, till sometime in July, 1800; and it can only be inferred from one of Barker and Lord’s letters, written to Wilway about that time, that they soon after wrote to the plaintiff to inform him of their intention to authorise Wilway. to draw to that amount. Barker nxA Lord, according to Tyler’s testimony, had been in the practice of consigning cargoes to the pilaintiff, and he had been in the practice of accepting their bills on the general credit of their consignment. It seems, the bills of lading they sent to him, were. never endorsed ; therefore, it would appear that he stood to them in relation to a factor, purely; and not as consignee, having a claim on the consignments made to him, or as ven-dee. Tyler, indeed, states that at the time when *260 the plaintiff accepted the bills drawn on him by XX « Barker and Lord, the balance of their general ae-count was considerably in his favour. This cir-j . cumstance seems to have produced the impression on Tyler’s mind, that the plaintiff did not accept those bills on the general credit of Barker and Lord, but'upon the faith of the expected consignment of the Eliza’s cargo. It is not improbable that the expectation of that consignment had some influence in the conduct of the plaintiff; but it appears to me that .the circumstance of the general balance being in favour of the plaintiff at that time, authorises an inference contrary to that which Tyler seems to have drawn. To an intelligent merchant, certainly, there would be little inducement to trust to the communication of Barker and Lord, and Wilway, respecting the cargo in question. At most, those communications only held out a probability that the consignment would be made to him. If he knew any thing of the charter party, he must have known, that it was not necessary the consignment should be made to him ; and, besides, the parties might alter their contract whenever they pleased,
A great deal has been said on the subject of letters to the plaintiff from one Thomas, informing him that Barker and Lord and Wilway had chartered a vessel, which was to be consigned to him, A communication in this way by a stranger, can never be supposed of any force in establishing a contract between parties to whom he stands indifferent. But it appears that in a letter written by Barker and *261 Lord to the plaintiff in January, 1800, they took the liberty to style Mr. Thomas “ our mutual friend.” This friendly expression is kid hold of, to convert this common friend into an authorised agent or broker^ and it is insisted that the acceptances in question were made upon the advice and assurance^ contained in the letters of Thomas to the plaintiff. I confess my incapacity to understand the logic by which this is made out. It would be dangerous to contract friendship, or to indulge in the use of friendly language, if such consequences were to result. I am at a loss to conceive afiy good reason why the plaintiff should rather trust to his friend Thomas, than to direct information from Barker and Lord. As a mere matter of information, he might do so with propriety, but not as a matter of security. How could it appear to him that Thomas had any authority from Barker and Lord to inform him of an intended consignment. It is likely they did say, or he might somehow understand, that the consignment was to be made to the plaintiffbut, in communicating that news to the plaintiff, Thomas probably never dreampt that he was pledging the cargo, or good faith of Barker and Lord to consign it to the plaintiff.
But why trust to communications from Thomas, when he held direct correspondence with Barker and Lord ? If neither their letters, nor the letters of Wilway gave him any assurances on which he could safely rely, it seems strange that he should build his faith on the credit of an indifferent corres- *262 pondenf, writing merely to give the news. Admitting, however, that the plaintiff did accept bills solely upon the faith and credit of the intended, or contemplated consignment, it will not follow that he thereby instantly acquired a lien on the cargo expected to be consigned. I willingly agree, that in case the cargo had afterwards come into the possession of the plaintiff by virtue of a consignment from Barker and Lord, and was their property at the time, and he had made advances, or was under acceptances, on the faith of the consignment on their account, he would have an undoubted right to retain it, (or the proceeds, in case the same was sold,) to indemnify himself for the amount advanced, or for which he was liable, and even to satisfy his general balance. Cowp. 251. 3 T. R. 119, 122. 6 E. 23. 2 East, 223. 227,
It does not appear to me, that the plaintiff made any advances or acceptances altogether on the faith of this cargo, nor can I see any obligation he was under to receive the cargo ; but I will suppose the case to be a clear one, and, that he had a right, after getting possession, to indemnify himself, provided the property remained in the consignor at the time of obtaining possession $ still, there would be a great difficulty to surmount; namely, the intervening assignment and changes of property, which is the next point in order to be considered.
The assignment is dated the 30th July, 1800, and was intended to transfer all the property, title, and *263 ¡interest of Barker and Lord in and to the cargo of fhe Eliza at that time. It is true the cargo was not actually delivered to the assignee at that time, the 1 1 • -1 O ° 1 1 ’ vessel being either at Savannah, or on her passage to Jamaica; yet, in my opinion, the delivery of the assignment operated a change of property in the same manner, as the delivery of a bill of sale. As between the parties to the assignment, it certainly altered the property, and transferred the title and right of possession. How far it could operate to affect third persons who might acquire a title from the vendor afterwards, and without notice of the prior sale, and obtain possession before actual delivery to the first vendee, may admit, perhaps, of some dispute. But this is a different case. The assignee afterwards, and before any sale and transfer, accompanied with delivery and possession to any other person was made, obtained possession by an actual delivery of the exchange cargo (which is the very cargo in question) to him in Charleston, as will be noticed hereafter. This, at all events, consummated the contract, and completed the transfer of property. If it be true that a contract as between vendor and vendee, where the delivery is to be at a distant place, is ambulatory till delivery. (2nd. T. R. 72.) this contract was so, and upon delivery was complete and perfect.
But it was contended that the assignee took the property, charged with a trust, in conformity with the agreement which has been already noticed, and the various communications which have been re *264 marked upon; or that, when it was delivered ta him, it was clothed with a trust which had attached in the interim, between the assignment and the actual delivery.
As to what took place anterior to the assignment, no farther observations are necessary to shew my opinion, and the reasons upon which it is founded, in relation to a prior existing lien or trust; and as to the assignment itself, it imports on the face of it, to be absolute, unconditional and unqualified. It does not appear to have been accompanied with any agreement or declaration of trust, nor does it appear to have been intended to operate otherwise, than as an absolute transfer of property, founded on a valuable consideration.
As to a supervening trust, or lien produced by subsequent transactions, and the tacit, or constructive consent, or acquiescence of the defendant, that point remains to be considered, and I shall as briefly as possible give my opinion upon it. On the 7th of August 1800, Barker and Lord, wrote to the plaintiff, and requested him to pay the defendant the balance in his hands, after satisfying himself; and; again, on the 28th of the same month, they wrote to him, saying, “ The ship alluded to, (meaning the Eliza) is now performing her passage to the Honduras,” and advising the plaintiff of the authority given to Wilway to draw for ¿£1000. By writing to pay the balance in the hands of the plaintiff to the defendant, Barker and Lord must have supposed there. *265 Would be a balance in tlieir favour, and perhaps, independent of the proceeds of the Eliza’s cargo, upon their general account; and this may account for their not then acquainting him with the assignment.
On the 5th of September, 1800, the defendant insured the Cargo, as his own. On the 17th of the same month, he wrote to the plaintiff, saying, that he hoped Barker and Lord Vf eve not in his debt, as they had failed. This was a friendly communication, and is evidence to show, that he did not know the plaintiff was in advance for Barker and Lord, or had subjected himself to a liability on their account, which would expose him to any inconvenience in consequence of their failure* To say it was a feigned, and hypocritical ignorance, would be mere assertion, unsupported by sufficient proof.
On the first of October, 1800, Wilway wrote to the plaintiff, informing him of his arrival at Honduras, and respecting the cargo of mahogany and dye-wood, which he says, was to be addressed to the plaintiff. This was purely matter of information, and amounted to nothing in creating a lien on the cargo, if it had been in the power of Wihbay, to do so; at any rate, so as to affect the property assigned. On the 18th of the same month, Barker wrote to the plaintiff, expressing a hope, that the balance of Barker and Lord’s general account would not be found in his favour, when the account should be brought to a close. This is evidence to show, that be was under the same impression, that the defend- *266 an^ was that the plaintiff had no claim on the scorte . of a lien, on the cargo m question.
Scion after this, Wilway died; and in November, f0jj0Wjn^ one QraJiam} having- administered on his estate, shipped the mahogany, and dye-wood to the plaintiff, taking invoices, and bills of lading, for the same on account and risk of Barker and Lard and Jonathan Wilway, and sent the bills of lading, endorsed by himself to the plaintiff, (together with the invoice) to be delivered to him, on condition of his accepting, and paying certain drafts in favour of Wilway, and Ludid, and Co. It was contended that the endorsement of the bills of lading gave the plaintiff a right of property in the cargo ; that the possession, afterwards, completed the transfer of property to him, and authorised him to retain the proceeds ; and that the subsequent prosecution of Gail-lard, under his assignment was insufficient to affect his right. I am entirely of a different opinion. It is true, that property passes by the endorsement of bills of lading, where the transaction is lawful, bona fide, and for a valuable consideration ; or if the ven-dee comes by it fairly, and property is intended to pass by the endorsement. 6 East. 506. 6 E. 44. But it is impossible to believe, that was the case here. The plaintiff was a mere factor, and endorsement was not intended to be a sale of the goods. 3 T. R. 122.
Besides, the administrator of Wilway, had no *267 right to endorse, nor had he any authority to charge the cargo with a lien or trust. If the plaintiff trusted to his unauthorised acts, and was deceived, neither Barker and Lord, nor the defendant, are responsible mi • i i-i for it. 1 here was no evidence to prove that either Barker and Lord, or the defendant gave any countenance, or encouragement to the acts of Graham. The defendant could have no interest, and, therefore, it cannot he supposed, that he had any design in doing so. On the 29th of December, 1800, Barker and Lord, wrote to the plaintiff, informing him of the assignment of Gaillard. This was probably done to put him on his guard, against the indulgence of any expectations from the cargo, which was consigned to him, on the score of his general balance. There is a certificate of one hill, that on the 8th of June, 1801, Graham’s draft ivas accepted; but, I deem this of no importance, as Graham had no authority to affect any interest Gaillard had in the eargo.
On the 20th of January, 1801, the defendant wrote to the plaintiff, expressing his surprise, and disappointment upon finding, that Barker and Lord were in his debt, as he, the defendant, had been in-ducéd by what they had stated to him, to expect ■from the plaintiff a considerable balance. He then goes on to inform the plaintiff, that Barker and Lord were largely indebted to him, the defendant, and, that to secure himself he had taken all he could; viz. an assignment of the cargo of the Eliza, which was to have been consigned to him, the plaintiff, and *268 then states, that Wihoay was concerned in the adventure ; and, that he would transmit the original agreement. In this communication, 1 can see nothing unfair or insincere; there is no proof that the writer did not feel, and believe, what he expresses in this letter, It seems perfectly natural, and consistent with his preceding letters and conduct, and this consistency appears to be preserved in the sequel.
On the 8th of February, 1801, the cargo arrived at Charleston, where the invoice was changed ; new bills of lading were made out, and delivered to the defendant, as shipper, in pursuance of the assignment ; and the defendant, consigned the same cargo to the plaintiff on his own account and risk. On the 9th of the same month, there was an additional charter party entered into. On the 23rd of the same month, Barker wrote from Charleston to the plaintiff, that the cargo had entered that port, and had been delivered to the defendant, and that he, Gaillard, would write to him on the subject. On the 25th Gaillard did write to the plaintiff, and enclosed the invoice and bills of lading, which the plaintiff received on the 14th of April, following.. From this evidence, it appears, that possession was actually delivered to Gaillard, conformably to the assignment; that he gave due notice thereof to Slater, and that he consigned the cargo to him, after it became his own property, on his own account and risk. But, before these letters reached Slater, o* *269 the 13th of March, 1801, he effected insurance on the cargo, in consequence of a letter from the i( mutual Mend,” {Thomas,) who appears to have been either his agent, or a busy- body, and not an agent of Barker and Lord, or of the defendant. Gaillard effected insurance for himself on the 1st of March. On the 20th of March, 1801, the plaintiff wrote to the defendant informing him, that the Eliza had not made her appearance, and, that when she did, every thing should be done to make the cargo turn out to the best advantage. At this time, it was probable, he had not heard of the assignment. On the 30th of April, he wrote again to the defendant, acknowledging the receipt of his letter of the 20th of January, containing the invoice and bills Of lading of the cargo, which had been transferred to, and ship - ped by Gaillard, as his own property, and consigned as such to the plaintiff. In this letter, he says, he was also very much surprised to hear of Barker and Lord’s failure ; that he wished information had reached him sooner of that event; that both of them would be sufferers by it. After this condoling, he goes on to say, that the Eliza had not arrived; that it would be fortunate if she never did; that nothing would be omitted on his part to make the most of the cargo upon its arrival, that the bills of the defendant had not been accepted, and others were pending ; and, that he would pay the bills drawn on him, when the cargo arrived. This is evidence to prove, that payment of Gaillard’s drafts were intended to be made out of the proceeds of the cargo as his property.
*270 p- js not clear from Tyler’s testimony what bills were accepted before the receipt of the cargo, nor on what credit they were accepted. On the 20th 9 t " May, 1801, the plaintiff writes again to the defend- (( qqie p;jjza ]-ias arrived. I will do every thing to make the cargo turn out as well as possible. But the cargo will nett little more than will pay the bills of Wilway & Graham, & Co.” Thus still treating the consignment as Gaillard’s property. Now upon, the supposition that the plaintiff had a right of property in the cargo, or a lien upon it, or that it had come into his hands charged with a trust for the benefit of Barker and Lord, how can his conduct be accounted for? Is it not inconceivable that he should not only keep profound silence to Gaillard on the subject of his claim, but acquiesce also in Gaillard’s information and instructions ? If he had that well founded claim on the cargo which he afterwards pretended he had, and was conscious of it, at the time he was answering Gaillard’s letters, (and he must have been conscious of it, if he had any such claim,) it was perfectly natural that he should have made it known ; and even that he should have reproached Gaillard with duplicity and foul play. Instead of that, he acquiesced and tacitly appi’oved every thing that was done, and promised to obey the instructions he had received from Gaillard.
All this proves to my judgment, that the claim afterwards set up by him was the offspring of an afterthought, and not the legitimate issue of settled *271 impressions on -his mind. It is not clear that any 1 , bills were accepted on the faith of this cargo, nor that any were paid till after the cargo arrived. Wilway and Graham’s hills were accepted and paid, probably, in order to get the bills of lading endorsed by Graham on that condition. Tyler’s testimony is rather equivocal; he states that on the receipt of the cargo, the plaintiff entered it in his books to the credit of Barker and Lord, deducting ¿£500, on account of Wilway ,* but this must have been done some time after his letter to Gaillard of the 30th of April.
Much was said in .the argument about the right of stopping in transitu ,* but I cannot perceive how the doctrine on that subject applies to this case. Seizing in transitu, is the exercise of a qualified right over the property of another, and exists only where the party entitled to exercise it, has possession of the property. It is founded on equitable principles. It cannot take place between vendor and vendeej where the property is paid for. It cannot take place between consignor and consignee, where the property is sent to the consignee as factor merely and not in the way of sale, as already paid for, because in that case, the property cannot be considered as subject in any degree to the control of the factor, or the factor as having any property in or right to the same, till it comes into his actual possession. If it can be supposed in this case that Slater had an equitable lien on the cargo, still he would have no right to the proceeds in prefer *272 ence to Guillará; for it is a clear principle, that as' between a person who has an equitable lien, and a third person who has purchased for a valuable consideration and without notice, the prior equitable , ... „ . . lien shall not over-reach the title of the vendee.. The purchaser has equity on his side as well as the legal title. To conclude, my opinion is that a new trial ought to be granted.
Smith, J.
This case has taken an extensive range in its discussion; I shall confine my opinion to a single point. It seems that both plaintiff and defendant had endorsed bills for Barker and Lord, Barker and Lord afterwards failed. Whoever can in this struggle, obtain the proceeds of the Eliza’s cargo, will be indemnified, and the other must suffer.
After Barker and Lord had delivered up the cargo of the Eliza to the defendant, he gave due notice thereof to the plaintiff in London, to whom he was indebted, sent him the bill of lading and invoice, and requested him to dispose of the cargo, and to carry the nett proceeds to the credit of the defendant in discharge of a part of his debt due to the plaintiff. The plaintiff by his letter of the 20th May, acknowledged the receipt of the letter of instructions, and wrote to the defendant that he would follow them ; nor did he inform the defendant that he intended to do otherwise, until the December following, 1801, when he wrote to defendant and *273 informed him, that he considered the cargo as the property of Barker and Lord and let him know for the first that he had a claim against Barker and Lord, . .. and considered himself as having a lien on the cargo. Be the right in whom it may, I .think the plaintiff concealed his claim too longhis acquiescence in the defendant’s right, and promise to dispose of the cargo, according to instructions, and apply the proceeds to defendant’s debt to himself, must have had such a tendency to lull the defendant, and relax his exertions against Barker and Lord, who might yet have been within his reach, as to amount to a complete forfeiture, or at least, to a postponement of his claim, on the ground of fraud. I am, therefore, for a new trial.
Coucock, J. concurred.
Bay, L
This was an action of assumpsit for the balance of an account between the parties as merchants. Mr. Slater was a merchant in London, who had been in the habit of receiving consignments from Mr. Gaillard, a merchant in Carolina, and hon-ouring bills drawn upon him on the credit of such consignment; and Mr. Gaillard, on his part had been in the habit of making shipments to him, and drawing bills on the credit of the cargoes consigned to his address. It was for the. balance of the money due to Kim, in the course of this mutual intercourse, that this suit was brought, and the jury found a verdict for the plaintiff.
*274 ft was not denied on the trial, nor in the course of the argument for a new trial, that there was a balance due to the plaintiff on the general account current. But the defendant set up a discount, and contended that he ought to have been allowed the amount of a cargo of log-wood and dye-wood, shipped on board of a ship called the Eliza from the bay of Honduras, which had been assigned to him by the house of Barker and Lord, merchants in Charleston, amounting to ¿01470 6s. 8d. sterling, and which he, the defendant, had sent on to the address of Mr. Slater after the assignment from Barker and Lord. Mr. Slater, the plaintiff on the other hand, admitted that the Eliza’s cargo came into his hands, but insisted that he had a lien on the cargo of the Eliza for bills drawn on him by the house of Barker and Lord, to enable them to purchase the cargo and load the Eliza, as well as for the balance of an account current he had against that house. The judge on the trial (Orimhe) recognized the right of the plaintiff’s lien on the Eliza’s cargo, and so charged the jury, who found a verdict for the plaintiff to the amount of the balance of his account, without giving credit for the Eliza’s cargo. It was for this supposed mistake in law and (alledged) mis-direction of the judge, that the present motion is made.
The only point of importance, therefore, submitted to the court on the argument for the new trial, was whether Mr. Gaillard, under his assignment from Barker and Lord, or the plaintiff Mr. Slater, by the law of merchants and course of trade, should *275 take the amount of the Eliza’s cargo ? And here it is proper for the right understanding of this case to have recourse to the evidence, and from this evidence, it appeared that the house of Barker ánd Lord, who had assigned to Mr. Gaillard, had through the recommendation of Mr. Gaillard, the mutual friend of both parties, made, while in business here, considerable shipments to Mr. Slater, and had been in the habit of drawing bills upon him in London, on the credit of those cargoes, to a large amount. It was stated (and not denied) that it was usual upon making consignments to merchants in London from this port, and from America in general, to draw upon the consignees for two thirds of the value of such cargoes, and that the merchants in London were, and had been for a long time in the habit of honouring bills so drawn upon them on the credit, of such consignments; and that without these accommodations, the commerce of the country could not be advantageously carried on.
It further appeared that during this kind of mutual intercourse between the house of Barker and Lord, and the plaintiff, Mr. Slater, they planned the voyage of the ship Eliza, the cargo of which is the subject of the present controversy; and upon this part of the testimony, it is necessary to be a little particular, to attend to dates and circumstances.
Some time in the beginning of the year, 1800, they entered into a contract with Jonathan Wilway, that *276 Wilway, should proceed to Portsmouth in New» England, or elsewhere, in America, and charter a ship to take in a cargo of lumber, at Wilmington or Savannah, and from thence to proceed to Jamaica : and from Jamaica to the Bay of Honduras; and the cargo to be purchased at Honduras, to be shipped pn the joint account of Wilway and Barker and Lord, (one half eaph) to be consigned to Mr. Slater, merchant in London, for sale ; and it was stipulated, that in ease the lumber in Jamaica, should be insufficient to purchase the cargo, at the bay of Honduras, then Wilway, was to be authorised to draw on them, Barker and Lord, for the difference; and in order to put Wilway, in funds, for' fear of disappointments, while the vessel was in Jamaica, Barker and Lord wrote to him in the beginning of July, 1800, if he should require it, to draw on Slater, for ,jg2000 sterling, to purchase this cargo at the Bay. Wilway, while at Jamaica, did accordingly, draw on him a bill for ¿0500 sterling, which was duly honoured and paid; and Barker and Lord drew for ^200 sterling more, which were invested in the purchase of the Eliza’s cargo. Wilway, after going to the bay, died, and his administrator, one Graham, completed the cargo, and forwarded invoices, and bills of lading, agreeable tp Wilway’s instructions, to Mr. Slater in London, who had directions to effect insurance on the cargo; which he accordingly made. So far in regard to the planning of the voyage ; the proceedings of the ship Eliza ; the loading-pi the bay, and the consignment at the bay of Honduras, and forwarding the bills of lading and invoices to Mr. Slater.
*277 li is now necessary to advert to and take a view . ^ . of another part of this case, as it relates to Mr. Gail-lard. While_ the ship Eliza lay at Jamaica, it was very unfortunately discovered, that the affairs of Barker and Lord had gone behind hand, and as Mr. Gaillard had endorsed their notes to a considerable amount, they were bound in honor to indemnify him by all ways and means in their power. In order, therefore, to make this indemnity, as far as .they eould, they made an assignment of their effects to Mr. Gaillard, and among other things, their interest in the cargo of the Eliza, then in Jamaica. The ship, after sailing from the bay of Honduras for Liverpool, touched at Charleston, in February, 1801, either for provisions, or some other purpose unknown, when Mr, Gaillard, under his assignment, took the direction and management of the cargo, as his property; got new bills of lading to himself, and sent it on to the port of destination as his own; and gave directions to Mr. Slater, for the sale and disposal of it, as if it was his own; and directed the proceeds to be placed to his credit. On the 29th December, 1800, Barker and Lord wrote Mr. Slater, and informed him that they had in the month of July preceding, (1800,) assigned over to Mr. Gaillard, all their interest in the cargo of the Eliza purchased in company with Mr. Wilway, and desiring Slater, to place to the account of Mr. Gaillard, their interest in the proceeds of said cargo, after deducting their part of the draft of ,£500, drawn by Wilway in Jamaica. On the 9th of February, 1801, they again wrote to Mr. Slater, and informed him, that. *278 the Eliza was off Charleston-bar, and was coming in; and that Mr. Theodore Gaillard, would write him particularly, &e. hoping that before the letter could reach him, he would not have made insurance on the carg0> On the 23rd February, 1801, they made an addition to their letter of the 9th February, 1801, saying, that the Eliza had entered the port, and that the cargo had' been delivered to Mr. Gaillard agreeably to the assignment; and that the Eliza would that day, clear from the custom-house, and sail with the first fair wind. Here the correspondence between Barker and Lord and Slater closed. The Eliza, it appears, sailed soon after from Charleston, and proceeded to Liverpool, where the cargo was delivered to Mr. Slater agreeably to the original bills of lading, at the bay of Honduras. Slater, in the due course of business, afterwards, sold the cargo, and stopped the proceeds for the bills, Barker- and Lord, had drawn upon him, and which he had accepted, and paid on the faith of this cargo, and the balance of an account he had against them, notwithstanding the assignment of Barker and Lord, upon the ground, that he had a prior lien upon it, for this amount ; so that the 'great question is, whether the assignment to Gaillard, or the mercantile lien of Slater has a preference ?
1st, On the part of the defendant in support of the motion, it was urged that the assignment, while the vessel lay at Jamaica, gave the defendant a right to Barker and Lord’s interest in the cargo of the Eliza, and that no implied lien could gain a preference j it *279 was an absolute transfer, which carried the property over to Qaillard, and that he had not been divested of it, by any known rule of law. ? J «
2nd, That the different bills drawn by Barker and Lord, had not been drawn on the credit of his cargo, but on the credit of different cargoes, which had been previously shipped by them, and upon a presumption that there was a balance in their favour of nearly ^1885 2s. 7d. according to the invoice prices ; but owing to a loss on the sales of some coffee, the balance was eventually against them.
3rd, That the sending on invoices and bills of lading, and desiring Slater to make insurances On the cargo, gave a mercantile lien on it, yet even in that case, it was too late, as they were all forwarded by Wilway from Honduras, in November, 1800, near four months after the assignment to Qaillard.
4th, That in a letter, written by plaintiff, in April, 1801, (in answer to Mr. Qaillard’s of February preceding, in which defendant desires him to place the proceeds of his cargo to his credit,) he is totally silent about the lien on the cargo, for the balance to him by Barker and Lord, which is an implied promise to comply with defendant’s instructions in regard to the cargo.
In reply it was contended on the part of the defendant :
*280 1st, That whenever one merchant in the course . of business, is in the habits of sending On cargoes tor another, with liberty to draw for two thirds of the J cargo, on sending on invoices and bills of lading, and C0BSjgnee^ on ]jís par^ is in the habits of accepting and honoring such bills on the faith of such cargoes, it gives such consignee a lien on the proceeds of such cargoes against all the world, and no transfer or bill of sale,- or assignment made by such shipper, to any third person, can ever deprive the consignee of the right of deducting in the first instance out of such proceeds, the amount of all that is due to himself.
2nd, That when the present voyage was contemplated and planned, it was intended by all the parties then concerned in it, that the cargo should be consigned to Mr. Slater, as will appear by the original agreement between Barker and Lord, and Wilway ,* and Slater was duly advised of it in the course of their correspondence with him, and when bills of lading were signed, and sent on to London with the invoices and orders of insurance, the contract was consumated between Barker and Lord, and as Slater, firmly to all intents and purposes, as if there had been an actual delivery on their parts.
3rd, That the <£500 drawn at Jamaica, and the ^200, must have been drawn on the faith of this cargo, as it appears they wrere in Slater’s debt upon a general balance of all former cargoes, so that it would be most unjust and unreasonable to deprive *281 him of the opportunity of indemnifying himself as well for such ceptances. bills, as the balance of all former ac-
4th, That the assignment under these circum* stances (although not intended,) was made mala fide} as it operated on Slater by diverting to other purposes, funds, that were originally contemplated to be placed in Slater’s hands, in order to indemnify him for the bills he had honored, or might honor, on the. eredit of the cargo.
5th, That the interest assigned over to Mr. Gail* lard, in July, 1800, while the Eliza lay at Jamaica, could not include the Eliza’s cargo, (which had not then been purchased or taken on board,) but, only Baker and Lord’s interest of the lumber, which had been sent on from Savannah. No other cargo then existed. The mahogany was acquired afterwards; it is not mentioned in the assignment, consequently the assignee could take no higher or other right than was vested in the assignor at the time, when it was made.
These are the principal grounds taken by the parties on both sides. The judges who heard this case argued, have given it that consideration which it merits; and a more important commercial case has seldom been argued within these walls. It is a question upon which much of the commerce, not only of Carolina, but of the Union depends; indeed, it is a case in whieh the citizens in general are deeply in- *282 teres ted. It is well known that the American commerce has flourished exceedingly, by the extensive credit that our merchants have obtained in foreign countries, and nothing can be so likely to secure and continue it, as good faith in the conduct of merchants to each other in their mutual intercourse. The privilege of drawing for three fourths of the value of the cargo in advance, upon a foreign merchant, is one of the greatest possible facilities to commerce ; as it enables the merchant in a great measure to purchase the cargo itself without the aid of other funds than the credit he obtained by it. It is therefore, easy to see that whatever goes to impair in the smallest degree the confidence raised between the shipper and consignee, gives a deadly blow to commercial transactions. Hence the origin of that mercantile lien which a consignee acquires, on the cargo shipped to his address, for the amount of all his acceptances and advances on account of the consignor; and the principle is founded in good sense and justice, since it is but reasonable and proper that a merchant, who accepts bills or advances money abroad on tbe credit of shipments to be thereafter made him, should have every possible security which the nature of such kind of transactions will afford or admit of. The law has, therefore, established it as a rule, that whenever a merchant sends forward a cargo with liberty to draw on his correspondent for three fourths of the value, on sending the invoices and bills of lading, it gives the consignee a lien on the cargo for whatever balance may be due to him. This forms a contract as firm and as bind' *283 ing as any other whatever. The case in East’s Rep. 227. is strong and conclusive on this point. c< A principal gave notice to his factor of an in- (< tended consignment of a ship to him for sale, and u in consequence drew bills on him which the fae- “ tor accepts, and then the principal dies. After iC the death of the principal, the executors direct “ the captain of the ship to follow his former orders* ei who accordingly proceeded from Jamaica to Lon- “ don, and delivered the ship into the possession of i( the factor who sells the same.' The executors of e< the deceased afterwards demanded the proceeds, “ of the factor, on the grounds that the deceased had (i done no act in his lifetime to vest the property in i{ the factor, and, therefore, by operation of law, it (l vested in the plaintiffs as his executors,” But the factor refused to pay the executors the proceeds^ on the grounds that he had a lien on it for disbursements on account of the ship, for the bills accepted and paid by him, as well as for the outstanding acceptances not then due: and upon suit being brought, it was held by the court that the factor had a lien on the procee ds of the ship to pay himself for all the disbursements and acceptances paid as well as for those not then due. In delivering the opinion of the court, Mr. Justice Grose laid down that a lien is a right in one man to retain that which is in his possession belonging to another, till certain demands of him, the party in possession, are satisfied. The evident consideration on which the premiums of insurance, and the amount of two bills were paid and the third accepted, was the consignment of the ship and cargo, *284 andit does not seem very consistent with justice to say, that after the consignee had advanced the money on the credit of the consignment, he should not have , . . . the fruits ox that, which was the foundation and COIlsi<jera{;ion Up0n which he disbursed the money. If there was no other case in the books but this to establish this doctrine, in my mind it would be com elusive, because it' is founded on the nature and justice of things, and tends to establish commercial confidence among the mercantile world; a point of the utmost consequence to a trading community. So in like manner, the assignee mf a policy of insurance on goods, who became such by the endorsement of the bills of lading of the goods by the consignor, after he had directed his correspondent to make the insurance, takes it subject to the lien of the consignor for his general balance, and can only claim subject to that lien, the money received by the broker on such policy. 2nd East, 523. So also an agreement to consign goods from Liverpool to London in order to gain a credit at a banking-house there for bills drawn upon it, and sending on invoices and bills of lading, though the ship was detained in Liverpool by an embargo, till the party became bankrupt, was held to give such a right to the London merchant, as to maintain trover against the captain for the cargo, notwithstanding the claim of the commissioners of bankruptcy. 1st Bos. & Pull. 563. All these cases, and many others referred to in them, go to shew and confine the mercantile lien, whieh every consignee has upon a ship and cargo, in all cases where he advances money, or accepts bills on the *285 credit" of the consignment, or gets assurances made for account of the shippers, and prove that the moment goods are put on board a ship or vessel, and 1 ■, -ii n t T r i i ^ , , the bills of lading are endorsed, or remitted to the consignee, they are clothed with the trust of com-píete indemnity to such consignee, notwithstanding they are to be sold for the account and risque of the original consignor. So far then with respect to the mercantile lien of a ship or cargo which goes into the hands and possession of the consignee.
Upon the second ground taken by the plaintiff’s counsel, I am of opinion, that the voyage was originally planned under an express idea, that the cargo should be shipped and consigned to the plaintiff, Mr. Slater, as appears by the agreement of Barker & Lord, and Wilway. That the bills must have been drawn by them on the faith and credit of this consignment, and accepted by the plaintiff on that account ; the more especially, as they mention in their letter of February, 1801, that the proceeds of the cargo, after paying the bill of £500 should be accounted for with Mr. Qaillard.
But at this point of the case, I am of opinion, it is very immaterial, whether the bills of £500, and ¿0200, were really and expressly drawn on the credit of this cargo, or not. The invoices and bills of lading were forwarded on to him, and orders arrived to make insurance on the eai’go. This, therefore, to all intents and purposes consummated their original agreement and intention, that the cargo should go *286 into his hands, and it did so; and having once come into his hands, then he had an undoubted right to indemnify himself, before he even parted with a shil-J y X ling of the proceeds ; and, to make use of the langUage 0f justice Grose, it would not be very-consistent with justice, at this day, to take the funds from him, and give them to another, not concerned in the transactions of the parties.
3rd, With regard to the transfer to Mr. Qaillard it appears to have been a fair transaction, and for a just and legal purpose of indemnifying him for his endorsements. No unfairness can be attributed to Barker and Lord, for malting it, as they were under the impression that a considerable balance was, from the invoice prices of the cargoes, due them from Slater. But this mis-apprehension of the real state of accounts between them, did not, nor could it alter the right of the lien, which Slater had in the cargo, for indemnity, as soon as it went into his hands ; the more so, as the original intention of the voyage was, that the proceeds should go into his hands, as the fund upon which their future credit was to be bottomed.
4th, As to the last ground insisted on by the plaintiff, it is very clear, that Barker and Lord, could, (upon a presumption that it had not been previously pledged to Slater,) only have ...assigned to Qaillard the interest they had in the cargo at the date of the assignment, which appears to have been only their share of the lumber sent down from Sa *287 ■vannah to Jamaica. The vessel had not then pro-1 eeeded to the hay of Honduras? the cargo of log-wood? and mahogany afterwards shipped? was not then in existence$ it had not then been purchased. It is very evident? therefore? it could not have been included in the assignment. If there has been any mis-application of the proceeds of the lumber after the assignment, (supposing Mr. Gaillard was already entitled to it,) he will still have his redress against those who appropriated those proceeds to other purposes than he intended. But he can have no right to the cai’go after it has been shipped and addressed to Slater? at Honduras? and the invoices and bills of lading transmitted him for insurances • and the obtaining new bills of lading in Charleston? while the ship was in transitu, did not in the small-i est degree alter the plaintiff’s right, as soon as the cargo went into his hands. For all these reasons? I am of opinion? that the judge on the trial? very Iproperly rejected the discount? and that the verdict [should remain unimpeached.
Nott? J.
Considering this case? as between Slater knd Barker and Lord, I apprehend there can be but little doubt? but what the plaintiff would have had a right to retain to the amount of the advances proved >y Mr. Tyler to have been made on the faith of the :argo. He had a right to expect from the whole of he correspondence from the time the vessel, first filed from Philadelphia to the time Wilway drew he bill for ¿0500 at Kingston? that it would be con *288 sbSne(i t0 him* He may not have had such a lien as would enable him to maintain an action of trover for the goods ; but he had at least, such reasonable expectation that it would have been a breach of good faith in Barker and Lord to have altered the destination of the vessel. The question then is not merely whether Slater had a legal lien on the goods, hut whether Mr. Gaillard had not such a knowledge of all the facts and circumstances as to afford a presumption that he took the assignment subject to this equitable claim. The jury appears to have been of that opinion, and I think the circumstances authorised them to draw such a conclusion. The distinction taken between a factor and vendee is ob„ vious. But that is not always the true ground on which a lien is to be predicated $ for sometimes a factor acts, as it is expressed, quasi vendee, and sometimes a consignee acts quasi {actor, and sometimes quasi Vendee; sometimes it is difficult to determine in which capacity it is most proper to consider him, and I do not think this ease steers clear of that difficulty.
• But most questions of this nature depend very much upon custom and usage, of which the jurors are generally the best judges. . Lord Mansfield is said to have acknowledged that he was indebted to the juries of Guildhall, for a great part of the knowledge he possessed of mercantile law; and I. musl confess, that in commercial questions, depending or the customs and usages of trade, where law and fact are so intimately blended, that it is difficult to distin *289 guish onfe from the other, I have more confidence in a Charleston jury than in my own judgment. Mr. Caillard admits the plaintiff had a lien to the amount of Wilwatfs hill; and from the language of his letters, that the jury were well authorised to conclude that he expected only the balance that should remain after the plaintiff’s demand against Barker and Lord was satisfied. There is no allegation of misdirection in the judge who tried the cause: I take it for granted, therefore, that the law was correctly stated to the jury. Upon the whole, I considered it as a proper case for a jury, and having had all the circumstances fairly before them, I think, their verdict ought not to be disturbed.